**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY E. BRADLEY,** | ) | **CASE NO. 3:12-CV-1504** |
| | ) | |
| **Petitioner,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **NEIL TURNER, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | **REPORT AND RECOMMENDATION** |

Petitioner, Gregory E. Bradley ("Bradley"), challenges the constitutionality of his conviction in the case of *State v. Bradley*, Van Wert County Court of Common Pleas Case No. CR09-03-038.  Bradley, *pro se*, filed his Petition for a Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254 on May 16, 2012.  Simultaneously, he filed a motion to stay the proceedings (Doc. No. 3) and, on June 22, 2012, the case was dismissed without prejudice, pending exhaustion of state court remedies.  (Doc. No. 5.)   The Court granted Bradley's motion to reopen the case on July 5, 2012.  (Doc. Nos. 6 & 7.)  On October 11, 2012, the Court ruled on five pending non-dispositive motions filed by Bradley, in essence denying the motions, but granting Bradley to November 11, 2012 to file his Traverse.  (Doc. No. 25.)  In the meantime, Bradley filed a Traverse on October 15, 2012.  (Doc. No. 26.)  On October 25, 2012, Bradley requested leave to amend and correct his Traverse (Doc. No. 27), which the Court granted on January 8, 2013.  For reasons set forth in detail below, it is recommended that Bradley's petition be denied.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  The state appellate court summarized the facts underlying Bradley's conviction as follows:

{¶ 1} Defendant-Appellant, Gregory Bradley, appeals from the judgment of the Court of Common Pleas of Van Wert County convicting him of one count each of rape and gross sexual imposition, sentencing him to an indefinite prison term of fifteen years to life, and classifying him as a Tier III Sex Offender. On appeal, Bradley argues that the trial court erred in admitting hearsay statements at trial under both the excited utterance exception pursuant to Evid.R. 803(2), and the medical diagnosis or treatment exception pursuant to Evid.R. 803(4); that his conviction for gross sexual imposition was unsupported by sufficient evidence and that both convictions were against the manifest weight of the evidence; that he was denied the effective assistance of counsel; that the trial court erred in convicting him of both rape and gross sexual imposition where the offenses are allied offenses of similar import; and, that he was denied his right to a fair trial due to cumulative errors committed by the trial court and his trial counsel. Based on the following, we affirm the judgment of the trial court.

{¶ 2} In March 2009, Bradley was indicted by the Van Wert County Grand Jury on one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree; one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree; one count of pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(5), a felony of the fourth degree; and, one count of illegal use of a minor in nudity-oriented material or performance in violation of R.C. 2907.323(A)(3), a felony of the fifth degree. The indictment arose from allegations by Bradley's daughter, B.B., that he engaged in improper sexual activities with her, including placing his finger in her anus. Bradley entered a not guilty plea to all counts in the indictment.

{¶ 3} In April 2009, pursuant to Bradley's motion, the trial court separated the trials, with the rape and gross sexual imposition counts to be tried separately from the counts on pandering sexually oriented matter involving a minor and illegal use of a minor in nudity-oriented material or performance.

{¶ 4} Subsequently, the State filed a notice of its intent to use several hearsay statements pursuant to Evid.R. 807 made by B.B. to her mother, grandfather, and the Van Wert County Department of Job and Family Services ("JFS") regarding Bradley's sexual abuse.

{¶ 5} In May 2009, the trial court held a hearing on the State's request to use B.B.'s hearsay statements, at which Shelly Bradley [FN1] testified on direct examination that Bradley was her husband; that they have two children together, B.B., who was five years of age, and K.B., who was two years of age; that, in November 2008, she and Bradley had an argument in which Bradley walked out of the house; that he left the residence around 6:00 or 6:30 p.m., and around 7:00 p.m. B.B. began jumping up and down on the couch and saying that "she was glad that daddy was gone so he can't hurt her no more" (motion hearing tr., p. 14); that she behaved in this manner approximately a half an hour after Bradley left; that she sat B.B. down on the couch and asked her to explain what she meant, and she stated that "her dad was touching her in her places, in her private spots, like her butt. She called it her butt and then she said that he would leave [sic] her play with a 'flipper'" (*id.*); that a "flipper" meant his penis; that she called her father, Allen Shinnaberry, to come to the house and talk to B.B.; that he arrived approximately a half an hour after she called him; that, subsequently, B.B. was "clinging to [her] and she was bawling a lot" (*id.* at p. 20); that B.B. also had diarrhea and was vomiting that night; and, that she had never caught B.B. lying to her.

FN1. We note that Bradley's name was spelled both as "Shelley" and "Shelly" throughout different filings in the record, and we are unsure of which spelling is correct. Accordingly, we elect to spell it as "Shelly."

{¶ 6} On cross-examination, Shelly testified that B.B. had separation issues in the past and did not like to leave her presence; that it was not unusual for B.B. to jump up and down on the furniture; that, although B.B. was initially happy upon Bradley's departure, B.B. began crying after she started talking to her; that she does not speak with B.B. about her privates and had never told B.B. that a penis was a "flipper"; that B.B. began jumping up and down almost immediately after Bradley left the residence; and, that her father spoke with B.B. approximately one hour after B.B. began reacting to Bradley's departure.

{¶ 7} Allen Shinnaberry testified on direct examination that he was Shelly's father; that, on November 1, 2008, he received a call from Shelly notifying him that Bradley had left the residence; that, a short time later, he received a call from his wife, who told him that there were some issues with B.B.; that he subsequently went to Shelly's house to speak with B.B.; that he left at 7:00 p.m. to go to the residence and went directly there; that, when he arrived, B.B. was acting "different," both "scared and happy" (*id.* at p. 39); that B.B. told him that she was happy that her father had left; that, he began speaking with B.B., and she indicated to him that "daddy stuck his finger up [her] butt" (*id.* at p. 40); that B.B. also stated that "I got more grandpa. There are more bad things that dad done, that daddy done" (*id.*); that B.B. wanted to tell him more, but he told her to not discuss it because she needed to go to the police station; that, up to that point, he thought B.B. had a good relationship with Bradley; that B.B. had never discussed with him any other inappropriate contact by Bradley; that, in his opinion, B.B. would not have made up a story to get rid of Bradley; that, later in the evening, B.B. had vomiting and diarrhea, and she was "horrified, horrified of her dad. Horrified of the house. Horrified of, you know, anything" (*id.* at p. 45); and, that he has never discussed with B.B. any names for body parts or any sexual acts dealing with them.

{¶ 8} On cross-examination, Shinnaberry testified that, when he arrived at Shelly's residence, he did not speak with Shelly about what B.B. had said; that he was at the residence for approximately five minutes before he took B.B. to the police station; that, while at the police station, he mentioned to the police officer that B.B. said something about a "flipper" to his wife, but not to him; and, that B.B.'s sister, K.B., also had diarrhea and vomiting around the same time as B.B.

{¶ 9} In May 2009, Bradley filed objections to the videotaped deposition of Dr. Lori Vavul-Roediger, asking the trial court to delete from the hearing of the jury hearsay testimony by Dr. Vavul-Roediger regarding Shelly's statements to her concerning the abuse by Bradley. Specifically, Bradley contended that these statements did not fit the exception for statements made for purposes of medical diagnosis or treatment pursuant to Evid.R. 803(4).

{¶ 10} Subsequently, Bradley also filed a motion in limine to exclude the hearsay statements made by B.B. to her mother and Shinnaberry regarding Bradley's sexual abuse, arguing that the statements were not an excited utterance under Evid.R. 803(2), and did not meet the exception for admissibility contained under Evid.R. 807.

{¶ 11} On June 2, 2009, the trial court found that the hearsay statements

3

regarding Bradley's sexual abuse made by B.B. to her mother and Shinnaberry were admissible under the excited utterance exception of Evid.R. 803(2). The trial court stated the following in its judgment entry:

> Shelley Bradley
> The court finds the alleged statement by the child to her mother, Shelley Bradley, are [sic] an "excited utterance" and thus admissible. * * * The alleged statement took place shortly after the Defendant left the home. According to Shelley Bradley, the conversation with the child was in response to the child jumping up and down on the couch shortly after the Defendant left the house. During the conversation, Shelley Bradley noted that the child was both laughing and crying, which goes to display excitement and stress of the event as required by the rule. Also, the alleged statement coupled with the child's excitement and stressed demeanor further indicate that the statement was not a result of reflective thought, but instead a statement made as an excited utterance.
>
> Further, the admission of a declaration as an excited utterance is not precluded by questioning which is not coercive or misleading, facilitates the declarant's expression and does not destroy the nervous excitement. In this instance Shelley Bradley simply questioned her daughter as to why she was so excited and happy which elicited the response that she was excited that the defendant could no longer hurt her.
>
> Allen Shinnaberry
> Similar to the situation with Shelley Bradley, the alleged statements made by the child to Allen Shinnaberry are an "excited utterance" and admissible under 803(2).
> The Court finds the comments made to Allen Shinnaberry were made within a relatively short period of time from the event (Gregory Bradley leaving the house). The court further finds the alleged statements by the child to Allen Shinnaberry were reactive statements and not reflective thinking. Although the statements were in response to questions specifically asked by Allen Shinnaberry, the court finds the child was still in a state of excitement, as noted by his testimony depicting her as both scared and happy, and therefore, the statements she was making were a product of an exciting event.

(June 2009 Entry and Decision on Defendant's Motions in Limine, pp. 1-2).

{¶ 12} Subsequently, the trial court also denied Bradley's objections to Dr. Valvul-Roediger's deposition testimony and found B .B. competent to testify.

{¶ 13} On June 8 and 9, 2009, the case proceeded to trial, at which Shelly testified on direct examination that she was married to Bradley and they had two children together, B.B. and K.B.; that, in November 2008, she worked part-time at Wal-Mart; that, when she would go to work, B.B. would "scream and bawl and holler that she didn't want [her] to leave" (trial tr., vol. 1, p. 24); that these actions began when B.B. was approximately fifteen months old and continued to get worse as B.B. aged; that, during this time, Bradley was not working and would stay at home and watch the children; that, on November 1, 2008, she and Bradley

4

began arguing, and Bradley walked out of the house; that, after Bradley left the residence, B.B. began jumping up and down on the couch because she was very happy; that B.B. was very excited and "looked like she was relieved that her dad was gone" (*id*. at p. 26); that she began talking with B.B., and B.B. became very upset and started to cry; that B.B. then proceeded to tell her that Bradley "touched her" and "stuck his finger up her butt" (*id*. at p. 28); that it was approximately an hour or an hour-and-a-half from the time that Bradley left to the time that B.B. made these statements; that, approximately four or six weeks prior to this incident, B.B. complained of "hurting down there," so she told Bradley that B.B. should go to the doctor, but he said that B.B. did not need to go (*id*. at p. 30); that, at that time, she observed that B.B.'s vagina was discharging white "slimy stuff," but that it did not appear to be red or irritated (*id*. at p. 31); that, on a separate occasion, she observed B.B.'s vagina to be red and irritated; that prior to the November 2008 incident, she and Bradley were having marital problems, and she filed for a divorce approximately one week after the incident; that she has been diagnosed with a learning disability and receives social security as a result; that, when she filed for divorce, she was concerned she would not be able to obtain custody of the children because Bradley used to tell her she was "too stupid" to have custody (*id*. at p. 35); that she never discussed sex acts or any sexual things with B.B.; that, after the November 2008 incident, B.B. attended counseling and also began acting out sexually with other children who were present, including having boys "pull their pants down," and during "one event, she had them lick her." (*Id*. at p. 38).

{¶ 14} On cross-examination, Shelly testified that she failed to mention when testifying at a prior hearing that B.B. acted out sexually; that she took B.B. to the doctor on prior occasions due to B.B.'s persistent screaming and crying when she would leave; that the doctor never checked her vaginal area on these visits; that, at some point, Bradley told her to not take B.B. to the doctor anymore because there was nothing wrong with B.B.; that, during the November 1, 2008 incident, Bradley threw a radio across the room at her, but, during her meeting with Dr. Roedinger [FN2] on November 4, 2008, she stated that Bradley was pushing her; that, later in the evening on November 1, 2008, she took B.B. to the hospital to be examined; that, in the presence of B.B., she informed the hospital personnel of Bradley's sexual abuse of B.B.; that part of the reason she did not file for divorce prior to the incident was she was afraid she would lose custody of her children; that children's services had visited her home on a previous occasion because of a report by B.B.'s physician that B.B. was not getting fed; that she did not question B.B. until approximately a half-hour after she began jumping on the couch after Bradley left the house; that Bradley left the house around 6:00 p.m., and Shinnaberry did not arrive at the house until 7:00 p.m.; that Shinnaberry talked to B.B. for approximately five minutes when he arrived at the house and then took her straight to the police station; that she was not aware he did not arrive at the police station until 8:45 p.m.; that B.B. was required to take suppositories up until the age of six-months, and Bradley usually administered the suppositories; and, that, during a prior hearing testimony, she did not testify to the slimy, white substance around B.B.'s vagina.

       FN2. We assume the testimony regarding the meeting with Dr.
       Roedinger refers to Dr. Valvul-Roedinger.

{¶ 15} Shinnaberry testified that he is Shelly's father and B.B.'s grandfather; that, approximately 7:15 or 7:30 p.m. on November 1, 2008, he was informed by his wife that there was a problem with Shelly and Bradley; that he was at church at that time working at a spaghetti dinner and concert, and had to wait to leave until

everyone else left; that, after the concert, he went to Shelly's residence; that, upon arriving at the residence, he was greeted by Shelly, B.B., and K.B., and B.B. seemed upset, although she was not crying; that he took B.B. upstairs to her bedroom; that he asked B.B. if she had anything to tell him, and she stated that Bradley placed his finger in her buttocks; that B.B. also told him "there [were] more bad things," but he told her he did not want to hear about it (*id*. at p. 74); that when B.B. told him this, she was "scared and terrified" (*id*.); that he then took B.B. to the police station to make a report of the incident; and, that, after a police report was made, he took B.B. to the hospital in Toledo to have her examined.

{¶ 16} Shinnaberry further testified that B.B. had never told him about any previous abuse by Bradley; that he did not notice anything unusual about B.B. prior to their conversation on November 1, 2008; that Shelly filed for a divorce from Bradley shortly after B.B. revealed Bradley's abuse; that Bradley managed the money Shelly received from Social Security Disability during the marriage, but that he now manages it; that he and Bradley "got along" during the marriage (*id*. at p. 79); that he has never discussed anything regarding private parts with B.B.; and, that, after the incident on November 1, B.B. had problems eating and sleeping, and would defecate in her pants. Shinnaberry continued that he arrived at Shelly's residence at approximately 8:00 p.m.; that, according to the police report, he arrived at the police station at 8:45 p.m.; and, that B.B. and Bradley had a good relationship prior to this incident, but that now, B.B. does not want Bradley to return.

{¶ 17} Detective Michael Freeman of the Van Wert Police Department testified that, on November 3, 2008, he received a call from Deb Booth of JFS regarding B.B.'s report of sexual abuse; that he then proceeded to Booth's office and spoke with Shelly; that, subsequently, he interviewed Bradley at the police department; that, during the interview, he asked Bradley about the allegations regarding B.B., and he denied them; and, that Bradley volunteered to provide a DNA sample.

{¶ 18} Dr. Vavul-Roediger testified via recorded video on direct examination that she was a pediatrician at the Dayton Children's Medical Center; that she examined B.B. on November 4, 2008, in response to a report of sexual abuse; that, prior to the exam, she discussed B.B.'s medical and social history with Shelly and a case worker from Children's Services, including the specific allegations of sexual abuse, because it allowed her to better formulate a medical assessment and diagnosis; that Shelly told her that two or three months ago, B.B. had alleged that Bradley sexually abused her; that, at the time, Bradley told her that B.B. was not being truthful, so she ignored the complaints; that Shelly continued that, on November 1, 2008, B.B. again indicated Bradley had sexually abused her in response to an altercation between Shelly and Bradley; that Shelly further stated that, on November 1, 2008, Shelly attempted to have B.B. examined at two different hospitals but was unable to because she was uncooperative and anxious; that Shelly also stated that B.B. had previously complained of genital and anal itching and that those areas had appeared red in the past, and that B.B. was very fearful of separating from Shelly and was nervous at times; that, during the exam, B.B. refused to cooperate with the majority of her requests, although she, Shelly, and other hospital staff were able to eventually persuade her to cooperate; that her examination did not reveal any scars or injuries in B.B.'s genital area; that she also did not observe any redness, irritation, or discharge around B.B.'s genitals; that B.B tested negative for gonorrhea, Hepatitis B and C, syphilis, and HIV; that, although there were no genital abnormalities revealed in the examination, the possibility of sexual abuse was not ruled out; that it was very common for a child

6

of B.B.'s age and maturity level to suffer sexual abuse and there be no physical findings; and, that, based on her examination of B.B., she rendered a diagnosis of suspected sexual maltreatment.

{¶ 19} On cross-examination, Dr. Vavul-Roediger testified that she did not speak one-on-one with B.B. regarding the sexual abuse; that she did not feel it was appropriate to attempt to obtain the details of the abuse from B.B. because she was already anxious and fearful, and because a case worker from Children's Services was present and had just completed a detailed forensic interview with B.B.; and, that if there was no physical evidence of sexual abuse discovered during an examination, a diagnosis of sexual maltreatment would be solely based on the history that was provided to the examiner.

{¶ 20} Deb Booth testified that she was an investigator for JFS; that she interviewed B.B. on November 3, 2008; that some of the common behaviors of children that have been sexually abused are defecating on themselves, aggression, regression, and eating difficulties; and, that it was common for sexually abused children to act out sexual behaviors on other children and toys.

{¶ 21} B.B. testified via recorded video on direct examination that she was five years of age; that she did not remember her father's name or when he lived with her; that her father would touch her buttocks; that she could not remember with what part of his body he would touch her buttocks; that, when he touched her buttocks, it was not a good feeling; that her mother was not around when he would touch her buttocks because she was working; that she saw her father with his clothes off; and, that her father touched her with "this part in the middle," referring to a drawn picture of an unclothed man. (Trial Tr., Vol. 3, p. 178). B.B. then pointed to the vaginal area of a drawn picture of an unclothed girl and stated that her father touched her in that area. B.B. also testified that she saw a white substance come out of her father when he touched her, but that she did not touch the white substance.

{¶ 22} On cross-examination, and by pointing to drawings, B .B. testified that no one has ever touched her in her private area or in her buttocks, and that her mother has put medication on her buttocks using gloves.

{¶ 23} Thereafter, the State rested and Bradley made a motion for judgment of acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶ 24} Bradley testified on direct examination that he was K.B. and B.B.'s father; that he and Shelly had been having marital problems for the past year; that he attempted to get Shelly to attend marital counseling, but she refused to participate; that, on November 1, 2008, he and Shelly began arguing regarding finances and spending time together; that, as a result of the argument, he left the house between 6:00 and 6:30 p.m.; that he returned around 1:00 a.m. and realized that Shelly had left the residence with the children; that he attempted to see the children at his father-in-law's residence, but he was not allowed in; that he and Shelly are currently going through a divorce; that Shelly received "temporary custody" of the home, so he was forced to leave (trial tr., vol. 4, p. 207); that B.B. had constipation problems, so he would occasionally have to administer suppositories to her; that Shelly was always present when he administered the suppositories, and B.B. always hated receiving them; that B.B. was approximately four years old when he had to administer the suppositories; that, on two occasions, B.B. saw him masturbating, one time when she snuck into the bathroom while he was in the shower, and one time while he was in the bed with

Shelly around 4:00 a.m.; that it would have been possible for B.B. to have seen him ejaculate on these occasions; that, on both these occasions, he did not intentionally masturbate in B.B.'s presence; that he tried to cover up when B.B. came into the room while he was masturbating; that he had been remodeling the house, so there was no door to the bathroom; that the only time he placed his finger in B.B.'s anus was when he administered suppositories; and, that he has never raped B.B., placed his penis into her vagina or anus, or had any type of "sexual contact" with her. (*Id.* at p. 211).

{¶ 25} Subsequently, the jury convicted Bradley on the rape and gross sexual imposition counts.

{¶ 26} On June 10, 2009, the State dismissed the one count of pandering sexually oriented matter involving a minor and the count of illegal use of a minor in nudity-oriented material or performance.

{¶ 27} In July 2009, the trial court sentenced Bradley to a prison term of fifteen years to life on the rape count, and a five-year prison term on the gross sexual imposition count, to be served concurrently.

{¶ 28} In December 2009, this Court dismissed Bradley's appeal for lack of jurisdiction due the failure of the trial court to include the means of conviction in the judgment entry of sentence pursuant to *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, and Crim.R. 32(C).

{¶ 29} In March 2010, the trial court resentenced Bradley to the same prison term of fifteen years to life on the rape count and five years on the gross sexual imposition count, to be served concurrently.

*State v. Bradley*, 2010 WL 4514269, *7 (Ohio App. 3rd Dist. 2010).

## II. Procedural History

### A.      Conviction

In January, 2009, a Van Wert County Grand Jury charged Bradley with one count of Rape in violation of Ohio Revised Code ("O.R.C.") § 2907.02(A)(1)(b) ("Count One"), one count of Gross Sexual Imposition in violation of O.R.C. § 2907.05(A)(4) ("Count Two"), one count of Pandering Sexually-Oriented Matter Involving a Minor in violation of O.R.C. § 2907.322(A)(5) ("Count Three"), and one count of Illegal Use of Minor in Nudity-Oriented Material in violation of O.R.C. § 2907.323(A)(3) ("Count Four").  (Doc. No. 22-1 at 1-2, Exh. 1.)  On April 23, 2009, the court granted Bradley a separate trial for Counts One and Two.[1]  *Id*. at 4-17, Exhs. 2-4.  On June 2, 2009, the court ruled on Bradley's motion in *limine* suppressing certain statements made

_____

[1]Counts Three and Four were subsequently dismissed.

8

by the victim to her grandfather and a social worker.  *Id*. at 71-75, Exh. 10.  A jury found

Bradley guilty of both Counts One and Two.  (Doc. No. 22-8 at 59.)  On July 23, 2009, the trial

court imposed a concurrent sentence of fifteen years to life imprisonment.  *Id*. at 86-90, Exh. 15.

### B.        Direct Appeal

On July 31, 2009, Bradley, through counsel, filed a Notice of Appeal with the Court of

Appeals for the Third Appellate District ("state appellate court") raising seven assignments of

error as follows:

1.     The trial court abused its discretion when it determined that [B.B.'s] hearsay statements to Shelly Bradley and Allen Shinnaberry constituted an excited utterance under Evidence Rule 803(2).

2.     The trial court abused its discretion when it determined that Shelly Bradley's recitation to Dr. Vavul-Roediger, of [B.B's] hearsay statement, was admissible under Evidence Rule 803(4).

3.     The state failed to prove each and every element of gross sexual imposition as alleged in the indictment for a jury to find that appellant committed gross sexual imposition beyond a reasonable doubt.

4.     The trial court erred in convicting appellant of both gross sexual imposition and rape because they are allied offenses of similar import.

5.     Appellant was denied the right to effective assistance of counsel and he was prejudiced as a result.[2]

6.     Due to the cumulative errors committed at trial, appellant was denied his right to a fair trial.

7.     The jury verdict is against the manifest weight of the evidence.

*Id*. at 104-105, Exhs. 16-17.)  On December 21, 2009, the state appellate court dismissed the

appeal for lack of jurisdiction after finding that the sentencing entry was not a final, appealable

order as it failed to include the means of conviction.  *Id*. at 185-186, Exh. 19.

### C.        Postconviction Relief

On January 29, 2010, Bradley, *pro se*, filed motions to vacate the void judgment and to

declare a mistrial because the sentencing entry was not considered a final appealable order.  *Id*.

---

[2]This assignment of error pertained to counsel's ineffective assistance for failing to "object to the content, manner, or procedure of any of the testimony of the victim."  *Id*. at 148.

at 187-220, Exhs. 20-21.  The trial court dismissed the motions.  *Id*. at 221, Exh. 22.  Bradley's *pro se* appeal, *id*. at 222, Exh. 23, was dismissed for lack of jurisdiction.[3]  *Id*. at 230-231, Exh. 24.

### D.    Resentencing

On March 23, 2010, Bradley was resentenced to the same term of incarceration as originally imposed.  *Id*. at 232-236, Exh. 25.

### E.    Direct Appeal of Resentencing

On April 22, 2010, Bradley, through counsel, timely appealed his resentencing, raising six assignments of error:

1.    Appellant was denied the right to effective assistance of counsel and he was prejudiced as a result.[4]

2.    The trial court committed plain error by allowing improper evidence of other acts that were prejudicial to appellant.

3.    Due to the cumulative errors committed at trial appellant was denied his constitutional right to a fair trial.

4.    The State failed to present sufficient evidence of each and every element of kidnaping in violation of Ohio Revised Code Section 2905.01(B)(2) and of felonious assault in violation of Ohio Revised Code Section 2903.11(A)(2) for a jury to find that appellant committing those crimes beyond a reasonable doubt.

5.    The jury verdict is against the manifest weight of the evidence.

6.    The trial court erred when it imposed more than the minimum sentence.

---

[3]Bradley also filed a successive motion and appeal regarding the denial of his motion for a new trial.  *Id* at 223-224.  Neither the trial nor appellate court ruled on this motion.  Bradley may not use habeas corpus to gain successive appellate reviews of the same issue.  *Agee v. Russell*, 92 Ohio St.3d 540, 548, 751 N.E.2d 1043 (2001); *State ex rel. Burch v. Morris*, 25 Ohio St.3d 18, 19, 494 N.E.2d 1137 (1986).  Moreover, a trial court has no duty to issue findings of fact and conclusions of law on successive or untimely petitions for postconviction relief.  *See State ex rel. George v. Burnside*, 118 Ohio St.3d 406, 889 N.E.2d 533, 534 (2008).

[4]Bradley raised the following ineffective assistance of counsel claims: (1) failure to object to the admission of improper other acts evidence; (2) failure to request a limiting or curative instruction regarding the admission of improperly admitted other acts evidence; (3) stipulating to the chain of custody on the State's key piece of evidence; and, (4) failing to file a suppression motion regarding the statements Bradley made to law enforcement in violation of his *Miranda* rights.  *Id*. at 249.

*Id*. at 237, 244-266, Exhs. 26 & 27.  On November 9, 2010, Bradley's conviction was affirmed.

*Id*. at 333-367, Exh. 28.  Bradley filed an untimely motion for reconsideration, which was

denied.  *Id*. at 368, 380, Exhs. 30-31.  Bradley did not pursue a timely appeal to the Ohio

Supreme Court.

      **F.**      **Postconviction Petition to Vacate or Set Aside Judgment and Other Motions**

      On September 13, 2010, Bradley, *pro se*, filed a petition to vacate or set aside his sentence

raising one claim as follows:

> [ ]a.  Statement of constitutional claim: Gregory Bradley's 14th Amendment right as it
> also applies [sic] to the Sixth Amendment, I Gregory Bradley have a right to a
> competent counsel.  My trial counsel was Ineffective at the time of trile. [sic]

> [ ]b.  I will prove by evidence avabile [sic] at the time of trile [sic] was not used by
> Ms. Rouch, and she failed to call witness that could have made a difference in my case
> and, Ms. Rouch did not follow my direction on how I want to present my case to the
> court.

*Id*. at 382-522.  On October 18, 2010, Bradley filed motions for default and for summary

judgment.  *Id*. at 571, 575, Exhs. 35-36.  On December 14, 2010, the trial court denied these

motions, finding the postconviction claim untimely and the default and summary judgment

motions without merit.  *Id*. at 585-588, Exh. 38.  On January 11, 2011, Bradley filed a motion for

findings of fact and conclusions of law.  *Id*. at 589, Exh. 39.

      On January 14, 2011, Bradley filed a *pro se* notice of appeal on his postconviction petition,

presenting eleven assignments of error:

1.      Van Wert County Prosecutor's Office of the State of Ohio has failed to
properly respond to the Appellant's motion for findings of fact and
conclusions of law.

2.      The trial court erred by stating "Discrepancies do not mean that the
prosecutor's created, supported or enhanced to factual inconsistencies in the
witnesses' statements."  The Appellant claims that prosecutor's did support
perjured testimony.

3.      Trial court erred by stating "The court finds issues argued by the Defendant
were considered by the jury."  The police reports were never seen or used at
the Appellant's trial, so how has the trial court concluded the jury
considered something it never saw?

4.      Trial court has ignored and not considered Evid.R. 613, Impeachment by
Self-Contradiction of the post-conviction claim and the prior inconsistent
statements made by the State's witnesses.

5. Trial court abused its judicial discretion by allowing inadmissible hearsay statements under Evid.R. 801, Hearsay, and committed plain error, Crim.R. 52(B).

6. Trial court abused its judicial discretion by allowing in hearsay statements of the State's witnesses, and improperly considered Evid.R. 803, Excited Utterance, and committed plain error, CrimR. 52(B).

7. Trial court abused its judicial discretion by allowing in hearsay statements of the State's witnesses under Evid.R. 807, and did not consider all the elements of Evid.R. 807, and committed plain error.

8. Ineffective assistance of trial counsel, and the trial court's failure to consider all the issues raised in the Appellant's post-conviction claim, as to how Appellant's trial counsel was ineffective.

9. Trial court has not even addressed the following issues of the Appellant's post-conviction claim and how they related to the State's witnesses: 2921.11 Perjury, 2921.13 Falsification, 2921.14, Making or Causing a False Report of Child Abuse or Neglect, and 2921.32 Obstructing Justice.

10. The Appellant claims the police selectively enforced the laws of Ohio and failed to enforce the laws of Ohio as the minor and illegal use of a minor in nudity-oriented material.  The State's witnesses were the only one in possession of this material, yet it was the Appellant that was charged with the crime.

11. Trial court has declared the Appellant's post-conviction claim to be untimely, yet the trial court has not said why it was untimely and what date it was using to declare the Appellant's post-conviction claim to be untimely.

(Doc. No. 22-2 at 634, Exh. 40.)[5]  The appeal was found to be untimely and, therefore, dismissed for lack of jurisdiction.  *Id*. at 782, Exh. 44.  The state appellate court also denied Bradley's application for reconsideration.  *Id.* at 784, 790, Exhs. 45 & 46.

Bradley filed a timely notice of appeal to the Ohio Supreme Court, raising two propositions of law:

I. The appellate court's denial of Appellant's appeal for being one day late violated Appellant's rights to have the appeal timely filed under Civ.R. 6(B)(2), thus denying Appellant his right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Ohio Constitution.

II. The appellate court's denial of Appellant's appeal for being one day late violated Appellant's right to have the appeal timely filed under Civ.R. 6(E), thus denying Appellant his right to due process of law under the Fifth and

_____

[5]At the request of the appellate court, Bradley filed a corrected brief.  *Id*. at 635-636, Exh. 41.

12

Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Ohio Constitution.

*Id*. at 794, Exh. 48.  On November 30, 2011, the appeal was dismissed as not involving any substantial constitutional question.  *Id*. at 814, Exh. 50.

### G.     Delayed Appeal to the Ohio Supreme Court

Meanwhile, on January 12, 2011, Bradley filed a notice of delayed appeal to the Ohio Supreme Court challenging the November 9, 2010 affirmance by the state appellate court (his resentencing).  After the appeal was allowed to proceed, *id*. at 815, 868, Exhs. 51 & 52,  Bradley filed a *pro se* memorandum raising five propositions of law:

I.     The trial court's abuse of judicial discretion in allowing the hearsay statements of State's witnesses as to what the alleged crime victim said with the non-existence of independent proof of said statements was in violation of Appellant's right to due process of law and a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

II.     The ineffective assistance of Appellant's trial counsel violated appellant's right to assistance of counsel under the Sixth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

III.     The prosecutor's misconduct in presenting false and misleading statements to the trial and appellate courts, having witnesses commit perjury, having witnesses give self-contradicting statements, committing obstruction of justice, and making or causing a false report of child abuse or neglect, all without independent proof of these allegations being proven true, violated Appellant's right to due process of law and a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

IV.     The trial court's conviction against the manifest weight of the evidence violated appellant's right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Ohio Constitution.

V.     The trial court's conviction against the sufficiency of the evidence violated appellant's right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Ohio Constitution.

*Id*. at 869, 870, Exh. 53.  On May 25, 2011, the appeal was dismissed as not involving any substantial constitutional question.  *Id.* at 951, Exh. 55.

### H.     Motion to Reopen Postconviction Petition

On December 13, 2011, Bradley filed a motion to reopen his postconviction proceeding

13

based upon a ruling by the Ohio Supreme Court[6] which he contended made his petition, filed on

September 13, 2010, timely.  *Id.* at 952, Exh. 56.  On January 10, 2012, the motion to reopen was

denied as untimely and without merit.  *Id.* at 974, Exh. 59.  On February 7, 2012, a motion for

reconsideration was also denied.  *Id.* at 976, Exhs. 60-61.

On February 16, 2012, Bradley sought review of his motion for reconsideration in the state

appellate court as follows:

1.  The trial court refuses to acknowledge the judgment entry of the Third District Court of Appeals as to when the Appellant was given a "final appealable order" and a proper judgment of conviction" so as to trigger the start of the 180 day clock for filing a post-conviction petition claim.

2.  The trial court has failed to fix a clerical error that was made by the Appellant. Appellant had filed a motion to the trial court with an incorrect date. The Appellant then filed a second motion to the trial court to have the clerical error fixed by the trial court by a nunc pro tunc order. The trial court has refused to fix the clerical error.

3.  The prosecution for Van Wert County and the trial court has once again refused to answer the Appellant's questions in full. The prosecution and the trial court have stood moot as to if there was or was not a Discovery Rule 16 violation and is now barred by res judicata and can't reply to this assignment of error.

4.  The trial court has refused to answer the Appellant's questions as to if the Discovery Rule 16 violation has made Appellant's indictment invalid on its face and if the appellant should be granted a new trial based on the true facts of this case and not the falsified police reports that have been kept hidden from the Appellant's jury and from the court.

5.  The trial court has stated "Any person convicted of a criminal offense who claims there was such a denial or infringement of the person's rights to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition in the court that imposed sentence." This is what the Appellant has done, but the courts of Ohio refuse to answer the Appellant's motions in full, ignore the rules of law, and fail to follow the rulings of the higher courts. The legal system in Ohio is nothing more than a legal farce and fantasy.

*Id.* at 995, 1000, Exhs. 62 & 63.  The appeal was dismissed for lack of jurisdiction because the

---

[6]Bradley relied on *State v. Everette*, 129 Ohio St.3d 317, 951 N.E.2d 1018 (2011), finding that the clock for calculating the timeliness of a defendant's postconviction petition begins to run when the certified, written transcripts of the underlying proceedings are filed, not when the videotapes of the proceedings were first filed.  Bradley's argument was that the clock should have started to run from the date of his resentencing hearing, when there was a final, appealable order.  *Id.* at 958, Exh. 56.

February 7, 2012 judgment entry was not a final order subject to appeal.  *Id*. at 1024, Exh. 64.

On March 12, 2012, Bradley appealed to the Ohio Supreme Court setting forth six propositions of law:

I. The trial court and the appellate court refuse to acknowledge the U.S. Supreme Court and the Ohio Supreme Court as to when an Appellant has a "final appealable order" and as to when the 180 day clock is to start to run for a post-conviction claim.

II. The trial court has failed to fix a clerical error that was made by the Appellant and now asks this court to fix this harmless clerical error.

III. The Appellant made a clerical error in his Notice of Appeal that should have been fixed by App.R. 3(A) & App.R. 3(F).

IV. The prosecution and the trial court have stood moot and failed to answer the Appellant's questions as to if there was or was not a Discovery Rule 16 violation in the Appellant's case or not. The prosecution is now barred by res judicata and can't reply to the Proposition of Law No. IV.

V. The prosecution has not responded to this Proposition of Law and as such is barred by res judicata and can't reply to it now. The Discovery Rule 16 violation has called into question the Appellant's indictment and whether or not the indictment is invalid on its face.

VI. The trial court has stated "Any person convicted of a criminal offense who claims there was such a denial or infringement of the person's rights to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition in the court that imposed sentence."

*Id*. at 1061, Exh. 66.  On June 20, 2012, the appeal was dismissed as not involving any substantial constitutional question.  *Id*. at 1061, Exh. 67.

## I. Federal Habeas Petition

On June 13, 2012, Bradley filed a Petition for Writ of Habeas Corpus asserting the following grounds for relief:

**GROUND ONE**: Petitioner was denied the right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. **Supporting Facts**:  Trial counsel was ineffective in failing to object to the testimony of the State's main witness where the child witness was permitted to answer questions by pointing to different circles on a piece of paper, and where the State asked leading and highly suggestive questions during direct examination. Petitioner was prejudiced by the ineffective assistance of counsel which resulted in his conviction.

**GROUND TWO**: Petitioner's conviction goes against the sufficiency of the evidence denying Petitioner due process of law under the Fourteenth Amendment of the Constitution.

15

**Supporting Facts**: The State relied upon hearsay testimony, multiple conflicting testimony by multiple witnesses, and purely circumstantial evidence to convict Petitioner. There was no physical evidence presented to convict the Petitioner. The State relied upon leading questions asked of the State's main witness and hearsay of other witnesses.

**GROUND THREE**: Petitioner was denied adjudication on the merits of his case when the prison failed to mail Petitioner's legal mail for 7 days denying him due process of law.
**Supporting Facts**: Petitioner placed his legal mail into the prison mail system on January 3, 2011. Petitioner's case manager signed this date of placement into the prison mail system. NCCI's cashier stamped the date of January 10, 2011 on this legal mail. The Third District Court of Appeals said Petitioner was one day late for filing an appeal.

**GROUND FOUR**: Petitioner [was] denied access to court as Ohio courts do not recognize prison mailbox rule in violation of the Fourteenth Amendment guarantee of due process of law:
**Supporting Facts**: Ohio courts do not recognize the prison mailbox rule. Therefore, as in Petitioner's case, inmates can be denied access to court due to the incompetence of prison mailrooms. Ohio compounds this problem by saying this federal rule of the United States Supreme Court and the Sixth Federal Circuit Court of Appeals does not apply to Ohio.

(Doc. No. 1.)

### III. Exhaustion and Procedural Default

#### A.    Exhaustion Standard

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings. *See* 28 U.S.C. § 2254(b),(c). This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). However, if relief is no longer available in state court, exhaustion can be rendered moot: "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

#### B.    Procedural Default Standard

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren v.*

16

*Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[7] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28. Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id.* In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal. *Id.* Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis

---

[7] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).

17

for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138-39.  "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule."  *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error."  *Id*.  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied.  *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994).  Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different.  *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).  Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented

18

at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D. Ohio 2007).

### C.        Application to Ground One

In ground one, Bradley contends that trial counsel was ineffective for failing to object to BB's testimony; specifically, when she was permitted to answer questions by pointing to different circles on a piece of paper representing affirmative or negative responses.  (Doc. No. 1 at 5.)  Bradley further contends that trial counsel was ineffective for failing to object to the prosecutor's leading questions.[8]  *Id*.  Respondent asserts that this ground is procedurally defaulted as Bradley raised different theories of ineffective assistance of counsel with the state court of appeals and the Ohio Supreme Court.  (Doc. No. 20 at 24-28.)

Bradley did indeed raise different arguments on direct appeal to the state appellate court and the Ohio Supreme Court.  The claims he now raises in his habeas petition were advanced to the state appellate court.  However, before the Ohio Supreme Court, Bradley claimed his trial counsel was ineffective for failing to: (1) introduce certain phone records into evidence, (2) cross-examine the social worker from the Van Wert County Department of Job and Family Services about obtaining independent proof of her interview with BB; and, (3) object to videotaped testimony from the doctor.  (Doc. No. 22-2, Exh. 53, pp. 877-878.)  Bradley, therefore, has defaulted ground one by failing to raise and pursue his claims through the state's "ordinary appellate review procedures."  *O'Sullivan*, 526 U.S. at 848.  He failed to present the same claims under the same theory.  Each claim must be fairly presented at every stage of the direct appeal.  The Ohio Supreme Court was never requested to review the ineffective counsel claims raised here.  Since these claims were not presented in a full round of state appeals,

---

[8]In the Traverse, Bradley raises new ineffective assistance of trial counsel claims.  He contends that trial counsel failed to object to statements made by BB's mother and grandfather that she would not lie.  These statements, however, were made at the evidentiary hearing, not at trial.  (Doc. No. 22-4 at 19, 44.)  Bradley also claims that trial counsel failed to introduce police reports that were favorable to him.  (Doc. No. 27 at 2-5.)  In addition, he raises a *Crawford* violation, arguing that he did not have the opportunity to cross-examine trial witnesses.  *Id*.  The Court finds these claims are procedurally defaulted as Bradley did not raise them to the state courts.

Bradley is prohibited from raising them now.  Ground one is procedurally defaulted.  *See Engle*, 456 U.S. at 125 n. 28; *see also Coleman*, 501 U.S. at 731-32.

Respondent argues that even if the Court considers Bradley's postconviction petition, ground one remains defaulted.  In Bradley's state petition he complained that trial counsel did not pursue the defense he desired, and pointed to inconsistencies between trial testimony and police records that he thought counsel should have focused upon.  (Doc. No. 22-1, Exh. 32.)  Again, these are different arguments than those raised on direct appeal.  Moreover, a petitioner cannot raise claims in postconviction petitions that could have been raised on direct appeal.  *Williams v. Anderson*, 460 F.3d 789, 807 (6th Cir. 2006).

In addition, Respondent contends that since Bradley's postconviction petition was denied as untimely, his claims of ineffective assistance of counsel are defaulted.  O.R.C. § 2953.21(A)(2) provides that a postconviction action must be filed no more than 180 days following the date in which the trial transcript was filed in the state appellate court.  The timeliness requirements of this statute are recognized as an adequate and independent rule that can bar a claim.  *See Nickleson v. Welch*, 2010 WL 5582881, *4 (N.D. Ohio Oct. 14, 2010); *Davis v. Warden*, 2009 WL 1162888, *4 (S.D. Ohio Apr. 29, 2009); *Townsend v. Gansheimer*, 2009 WL 589332, *7 (N.D. Ohio Mar. 9, 2009).  In Bradley's postconviction petition, he claimed ineffective assistance of trial counsel for failing to call witnesses, present evidence, and not following Bradley's directions on how to present his case.  (Doc. No. 22-1, Exh. 32 at 383.)  In the instant Habeas Petition, however, Bradley's ineffective assistance of counsel claims involve counsel's failure to object to BB's testimony and to the prosecutor's leading questions.  Furthermore, to the extent that Bradley attempts to raise additional claims of ineffective assistance of counsel in his Traverse (see footnote 6), these claims were also not sufficiently raised with the state courts.

Even if the claims were properly raised, they would have been untimely.  The docket indicates that the trial transcript was filed in the appellate court on September 9, 2009.  (Doc. No. 22-2, Exh. 68.)  Bradley's postconviction petition was not filed until September 13, 2010, well beyond the 180-day limit.  The trial court, enforcing the timeliness requirement, dismissed the petition.  (Doc. No. 22-1, Exh. 38.)  Bradley argued in his state pleadings that because the

original direct appeal resulted in a remand for resentencing (Exh. 19), the 180-day deadline should run from his second direct appeal filed on April 22, 2010.

Ohio courts, however, have determined that "the time limit for a postconviction relief petition runs from the original appeal of the conviction, and that a resentencing hearing does not restart the clock for postconviction relief purpose as to any claims attacking the underlying conviction." *State v. Piesciuk,* 2010 WL 2653385, *2 (Butler App 12th Dist. Jul. 6 2010) appeal not allowed, 2010-Ohio-6008, 127 Ohio St. 3d 1461, 938 N.E.2d 363 *(quoting State v. Seals*, 2010 WL 1795410, *1 (Cuyahoga Cty 8th App. Dist. May 6, 2010)) (*citing State v. Haschenburger*, 2009 WL 4758813, *5 (Mahoning Cty 7th Dist. Dec. 10, 2009)). "To hold otherwise would extend beyond the time limits set forth in R.C. 2953.21(A)(2) to an undetermined time in the future." *Haschenburger* at 5.

Bradley contends that he is able to overcome any default by demonstrating cause and prejudice. He asserts that his cause for failure to comply with state procedural requirements is based upon Ohio not recognizing the federal mail box rule. (Doc. No. 26 at 10.) He also asserts that he was prejudiced when he was not given a merits hearing or allowed to timely appeal his state postconviction petition. *Id.*

The Sixth Circuit has found that a prison official's inaction in the mailing of a prisoner's legal mail that results in the denial of an application for leave to appeal as untimely "presents an 'objective factor external to the defense that impeded . . . efforts to comply with the State's procedural rule.'" *Maples v. Stegall*, 340 F.3d 433, 439 (6th Cir. 2003); *Hines v. Brunsman*, 2010 WL 750176, *19 (N.D. Ohio Feb. 26, 2010). The *Maples* Court explained that even though the prison mail box rule, established in *Houston v. Lack*, 487 U.S. 266 (1988), is not binding on the state, *see, e.g., Adams v. LeMaster*, 223 F.3d 1177, 1183 (10th Cir. 2000) (noting that "the *Houston* decision is not binding on state courts"), it is sufficient to excuse a procedural default. The *Maples* Court indicated, "Where a *pro se* prisoner attempts to deliver his petition for mailing in sufficient time for it to arrive timely in the normal course of events . . ., the [prison mail box] rule is sufficient to excuse a procedural default based upon a late filing." *Maples*, 340 F.3d at 439.

21

Here, Bradley contends that he attempted to file a notice of appeal of the denial of his postconviction petition in a timely manner when he presented it to the prison mailroom on January 3, 2011.  (Doc. No. 26 at 10.)  Under Ohio App. R. 4(A), Bradley had thirty days to file a timely appeal from the December 14, 2010 denial.  The appellate court dismissed the appeal as untimely when it was filed one day late, on January 14, 2011.  (Doc. No. 22-2 at 782.)  Bradley provides evidence that he presented the package to the prison staff on January 3, 2011, for mailing, but it was not time-stamped and processed until January 10, 2011, presumably the date upon which the package was then mailed.  *Id.* at 789.  The state appellate court received the filing on January 14, 2011.  *Id.* at 782, Exh. 44.  Bradley contends it would have been timely if the prison officials had mailed it promptly.

Applying *Maples*, Bradley has demonstrated cause and prejudice regarding the handling of the appeal of his postconviction petition.  Therefore, any claims he raised in his postconviction petition could be reached on the merits – if he raised the same claims in his Habeas Petition.  In Bradley's postconviction petition, he claimed ineffective assistance of trial counsel for failing to call witnesses, present evidence, and not following Bradley's directions on how to present his case.  (Doc. No. 22-1, Exh. 32 at 383.)   In the instant Petition, however, Bradley's ineffective assistance of counsel claims regarded counsel's failure to object to BB's testimony and to the prosecutor's leading questions.  Even though Bradley may have been able to demonstrate cause and prejudice as to certain ineffective assistance of counsel claims, he has not done so regarding the claims raised in his Habeas Petition.  As such, Ground One remains procedurally defaulted.

Before a claim of ineffective assistance of counsel can be considered as cause to excuse procedural default, the claim must first be fairly presented to the state courts.  *See Edwards v. Carpenter*, 529 U.S. 446, 452-53, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (holding that an ineffective assistance of counsel claim offered as cause for the default of a substantive federal claim must first be properly presented to the state courts). Bradley's ineffective assistance claim now before this Court was not properly presented to the state courts.  In addition, where petitioner is represented by entirely new counsel on direct appeal, as Bradley was, claims of ineffective assistance of trial counsel that do not rely on evidence outside the record must be

22

raised on direct appeal or they will be waived under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982); *see also Combs v. Coyle*, 205 F.3d 269, 275-77 (6th Cir. 2000).  Any ineffective-assistance claims that Bradley could have asserted in his direct appeal, but did not, are defaulted under the Ohio doctrine of *res judicata*. *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *State v. Szefcyk*, 77 Ohio St.3d 93, 671 N.E.2d 233 (1996) (syllabus); *Perry*, 10 Ohio St.2d at 176, 226 N.E.2d at 105–106 (syllabus, ¶ 9).  *Res judicata* will apply when a defendant who is represented by new counsel on direct appeal, as Bradley was, fails to raise the issue of ineffective assistance of trial counsel. *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004), *cert. denied*, 544 U.S. 1037, 125 S.Ct. 2260, 161 L.Ed.2d 1066 (2005); *Monzo v. Edwards*, 281 F.3d 568, 576–577 (6th Cir. 2002).  Bradley has not raised any ineffective claims related to his appellate counsel.  Finally, as noted above, claims that Bradley raised in his untimely postconviction action are not properly before this Court as he did not satisfy the conditions set forth in O.R.C. § 2953.23 for filing a timely, successive postconviction action.

Bradley further contends that a miscarriage of justice will result because he is innocent. (Doc. No. 26 at 10.)  He also asserts his innocence in his motion for leave to amend his Traverse.[9]  (Doc. No. 27 at 2.)  Conclusory statements as to innocence, however, are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *see also Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D. Ohio 2007).  Bradley has not

---

[9]In Bradley's motion for leave to amend his Traverse, he explains an earlier argument regarding a motion for discovery, which the Court denied without prejudice in an order dated October 11, 2012.  (Doc. No. 25.)  Bradley requested discovery based upon the Invited Error Doctrine, referring to a statement the prosecutor made to the state appellate court in a brief.  The doctrine of "invited error" refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit during trial. *See* 5 Am.Jur.2d § 713 (1962).  Here, Bradley appears to be complaining of the prosecutor's contention that the police report had nothing to do with the grand jury indictment.  The statement at issue, however, was not made at trial, but in an argument to the state appellate court.

23

presented any new evidence.  Thus, as a result of his procedural default, the grounds for relief presented in Bradley's habeas corpus petition may not be considered on federal habeas corpus review.

## IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett*, 559 U.S. –, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002))  The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 2012 WL 2076341, *6; *Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's

24

decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, ––– U.S. ––––, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87.  This is a very high standard, which the Court readily acknowledges.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### A.  Ground Two - Sufficiency of Evidence

In ground two, Bradley contends that there was insufficient evidence for convictions of rape and gross sexual imposition as the State relied upon hearsay testimony, conflicting testimony by multiple witnesses, and circumstantial evidence.  (Doc. No. 1 at 10.)

25

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363-64 (1970). The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *See id.; Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983). Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record . . . should be resolved in favor of the prosecution." *Heinish v. Tate*, 9 F.3d 1548, 1993 WL 460782 (6th Cir. 1993) (unpublished opinion), *citing Walker*, 703 F.3d at 969-70; *Wright v. West*, 505 U.S. 277, 296 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)

The Sixth Circuit has held that the testimony of the victim alone is constitutionally sufficient to sustain a conviction. *United States v. Terry*, 362 F.2d 914, 916 (6th Cir. 1966) ("The testimony of the prosecuting witness, if believed by the jury, is sufficient to support a verdict of guilty."); *see also O'Hara v. Brigano*, 499 F.3d 492, 500 (6th Cir. 2007) (holding that victim's testimony that habeas petitioner abducted her and raped her was constitutionally sufficient to sustain conviction despite lack of corroborating witness or physical evidence); *United States v. Howard*, 218 F.3d 556, 565 (6th Cir. 2000) (holding that even if the only evidence was testimony of the victim, that is sufficient to support a conviction, even absent physical evidence or other corroboration); *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996) (noting that there is sufficient evidence to support a conviction even if the "circumstantial evidence does not remove every reasonable hypothesis except that of guilt") (internal quotation marks omitted).

The state appellate court determined there was sufficient evidence to support Bradley's convictions of rape and gross sexual imposition as follows:

{¶ 53} In his third assignment of error, Bradley claims that his conviction for gross sexual imposition was unsupported by sufficient evidence. Specifically, he argues that no evidence was presented that his touching of B.B. was for purposes of sexual arousal or gratification, and that B.B. only testified to one incident of sexual touching, which was insufficient to support both a rape and a gross sexual imposition conviction.

* * *

{¶ 55} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, *citing State v. Jenks* (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, *supra*.

{¶ 56} Bradley was convicted of rape in violation of R.C. 2907.02(A)(1)(b), and gross sexual imposition in violation of R.C. 2907.05(A)(4). The offenses provide as follows, respectively:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

R.C. 2907.02(A)(1)(b).

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

* * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2907.05(A)(4).

{¶ 57} Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). In determining whether the contact was for purposes of sexual arousal or gratification, " 'the proper method is to permit the trier of fact to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01. In making its decision the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant. From these

facts the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim.' " *State v. Huffman*, 3d Dist. No. 13-2000-40, 2001-Ohio-2221, *quoting In re Alexander*, 3d Dist No. 9-98-19, 1998 WL 767457.

* * *

{¶ 59} At trial, B.B. testified that Bradley touched her buttocks, and that Bradley also touched her vagina. Additionally, B.B. testified that Bradley touched her with his penis, and that she also saw a white substance come out of Bradley's penis. Moreover, both Shelly and Shinnaberry testified that B.B. told them that Bradley inserted his finger in her buttocks.

{¶ 60} Based on the testimony presented at trial, we find that sufficient evidence existed to support a conviction for gross sexual imposition under R.C. 2907.05(A)(4), as testimony was presented that Bradley touched B.B.'s buttocks and vagina, that B.B. was under thirteen years of age, and that Bradley ejaculated, the latter fact being sufficient to allow a reasonable jury to conclude that the contact was for purposes of sexual arousal or gratification.

{¶ 61} Furthermore, we find that two distinct and separate sexual acts were described, one in which Bradley inserted his finger into B.B.'s buttocks, and one in which Bradley touched B.B.'s vagina. The conclusion that two separate acts occurred is further supported by B.B.'s testimony that Bradley touched her with his penis.

{¶ 62} Consequently, because evidence was presented establishing all the elements of gross sexual imposition under R.C. 2907.05(A)(4), and because B.B. testified to two separate acts, we find that Bradley's conviction for gross sexual imposition is supported by sufficient evidence, and that his convictions for rape and gross sexual imposition are not improper convictions for allied offenses of similar import.

*State v. Bradley*, 2010-Ohio-5422, 2010 WL 4514269, *11-12 (Ohio App. 6th Dist. Nov. 9, 2010).

The state appellate court also addressed the manifest weight of the evidence as to both

convictions as follows:

{¶ 72} In his seventh assignment of error, Bradley asserts that his convictions were against the manifest weight of the evidence. Specifically, he contends that no physical evidence was presented by the State to support the convictions; that Shelly's testimony regarding B.B.'s statements lacked credibility due to Shelly's motive to fabricate the story; and, that the State's only evidence of the sexual abuse was inadmissible hearsay statements from Shelly, Shinnaberry, and Dr. Vavul-Roediger, and statements from B.B. that were elicited by suggestive and leading questioning. We disagree.

{¶ 73} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, superseded by constitutional amendment on other grounds as stated by *Smith*, 80 Ohio St.3d 89, *quoting State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id.*

28

{¶ 74} In the case sub judice, Shelly testified that B.B. became very excited shortly after Bradley left the residence; that B.B. told her that Bradley "touched her" and "stuck his finger up her butt" (trial tr., vol. 1, p. 24); that B.B. made prior complaints to her regarding pain in her vaginal area; that she previously observed B.B.'s vagina to be red and irritated; and, that when B.B. attended counseling after disclosing Bradley's sexual abuse, she acted out sexually with other children.

{¶ 75} Additionally, Shinnaberry testified that B.B. also told him that Bradley inserted his finger into her buttocks; that B.B. was very frightened when she told him about the abuse; and, that, after B.B. disclosed Bradley's abuse, she had difficulty eating and sleeping, and was sometimes unable to control her bowl [sic] movements.

{¶ 76} Moreover, B.B. testified that Bradley touched her buttocks and vagina; that Bradley would touch her with his penis; that she saw a white substance come out of Bradley's penis; and, that it did not feel good when Bradley touched her buttocks.

{¶ 77} On the other hand, Bradley testified that he and Shelly had been having marital difficulties over the past year; that he attempted to get Shelly to attend marital counseling, but she refused; that he had to occasionally administer suppositories to B.B. up until she was four years old; that B.B. sneaked into the bedroom on one occasion, and the bathroom on another occasion, and saw him masturbating; that he did not intentionally masturbate in front of B .B., but she might have seen him ejaculate; that the only time he placed his finger in B.B.'s anus was to administer suppositories; that he has never raped B.B. or placed his penis in her anus or vagina; and, that he has never had any "sexual contact" with B.B. (Trial tr., Vol. 4, p. 207).

{¶ 78} Additionally, Dr. Vavul-Roediger testified that she examined B.B. in regards to the alleged sexual abuse; that B.B. was uncooperative throughout the exam, although she was able to complete the exam; that her examination did not reveal any scars, injuries, redness, or irritation around B.B.'s vagina; that B.B tested negative for gonorrhea, Hepatitis B and C, syphilis, and HIV; and, that she diagnosed B.B. as being suspected of sexual maltreatment because it was very common for a child of B.B.'s age and maturity level to suffer sexual abuse and there be no physical findings.

{¶ 79} Based on the evidence presented, it is clear that Bradley's conviction was not against the manifest weight of the evidence. Shelly and Shinnaberry both testified to a fearful B.B. telling them of Bradley's sexual abuse, and B.B. also testified to the same account of the incident as she told her mother and grandfather. While Bradley testified that he never sexually abused B.B.; that B.B.'s account of him touching her buttocks was due to his administration of suppositories to her; and, that B.B. testified that she saw him ejaculate because he inadvertently masturbated in front of her, the jury likely found Bradley's self-serving testimony to be unreliable. *See State v. Lowd*, 3d Dist. No. 5-09-16, 2010-Ohio-193, ¶ 17, *quoting State v. Thompson* (1998), 127 Ohio App.3d 511, 529 ("The fact-finder * * * occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witnesses' reaction to exhibits and the like").

{¶ 80} Furthermore, the lack of physical evidence of the offenses, as testified to by Dr. Vavul-Roediger, does not necessarily imply the offenses did not occur, as she also testified that it is common for there to be no physical findings in sexual abuse cases.

*State v. Bradley*, 2010-Ohio-5422, 2010 WL 4514269, *14-15 (Ohio App. 6th Dist. Nov. 9, 2010).

Based on this Court's own review of the trial transcript, the state appellate court accurately summarized the evidence of record and correctly identified the applicable law.  (Doc. No. 22-7 at 174-181.)  In light of the evidence against Bradley, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011) (*quoting Jackson*, 443 U.S. at 319); *see also United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." (internal quotation marks omitted)).  Furthermore, the testimony of B.B. was alone sufficient evidence to support the conviction.

Additionally, when this case is given "double deference" in applying AEDPA, the Court is limited to reviewing whether the state court's decision was so objectively unreasonable as to be "a close call."  *See Lopez*, 426 F.3d at 358 n. 1.  The Court is unable to say that the decision was out of line with the general standard set forth in *Jackson v. Virginia*.  The state appellate decision denying Bradley's sufficiency of evidence and manifest weight claims was not objectively unreasonable.[10]  When viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have found Bradley guilty of both rape and gross sexual imposition.  As such, this Court finds that the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.  Bradley's second ground for relief is, therefore, without merit.

### B.  Grounds Three and Four

In Ground Three, Bradley contends that he was denied due process when prison authorities

---

[10]The state appellate court applied the standard applicable to manifest weight claims to the gross sexual imposition charge.  In *Nash v. Eberlin*, the Sixth Circuit construed a manifest weight claim as a sufficiency of the evidence claim for habeas review purposes. 258 F. App'x 761 (6th Cir. 2007).  Additionally, the *Nash* court concluded that because the petitioner had argued a manifest weight claim throughout his state proceedings, the sufficiency claim was not procedurally defaulted.  *Id.*  According to the *Nash* court, Ohio courts adequately passed upon the sufficiency claim because the "determination by the Ohio court of appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence." *Id*. at 765 (quoting *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985)).

delayed the mail containing his appeal of the denial of his postconviction petition.  (Doc. No. 1 at 14.)  The appeal was dismissed as untimely because it was one day late.  *Id.*  In Ground Four, Bradley claims a denial of access to the courts because Ohio courts do not follow the federal mailbox rule.  (Doc. No. 1 at 16.)  Respondent avers that these issues are not proper in habeas as Bradley is complaining about conditions of confinement, not the constitutionality of his conviction.  (Doc. No. 20 at 36-38.)  Respondent contends that such issues would be more appropriately filed as a 42 U.S.C. § 1983 civil action.  *Id.* at 36.  Respondent further argues that the state court's finding Bradley's postconviction appeal untimely is not cognizable in federal habeas as it involves an error by the state court in a collateral proceeding.  *Id.*

The United States Supreme Court noted that prisoners can challenge the validity of their confinement or to "particulars affecting its duration" by way of a federal habeas corpus petition. *Muhammad v. Close*, 540 U.S. 749, 750, 124 S.Ct. 1303 (2004).  However, prisoners' requests regarding the circumstances of confinement may be presented in a 42 U.S.C. § 1983 action.  *Id. See Pearson v. Simms*, 345 F.Supp.2d 515 (D. Md. 2003) (§ 1983 action is proper when claiming that the delay of legal mail deprived prisoner of meaningful access to the courts); *see also Hodges v. Bell*, 170 Fed. App'x 389 (6th Cir. 2006).  The Sixth Circuit has held that in such a case a district court should dismiss the habeas petition without prejudice to allow the petitioner to raise any potential civil rights claims properly as a § 1983 action.  *See Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004).

The Court finds that Grounds Three and Four regarding Bradley's denial of timely access to the state court are not cognizable in federal habeas.  Nonetheless, pursuant to *Maples*, the Court allowed the delayed mailing to establish cause when considering whether Ground One was procedurally defaulted.  The appeal in question had no impact upon Ground Two.

### V.  Letters Submitted by Petitioner Regarding Stun Belt

By way of letters to the Court dated January 3, 2013, January 23, 2013, and January 31, 2013, Bradley claims that the County Sheriff, requiring him to wear a stun belt during the trial, violated his due process rights as his testimony was given under duress and he was not able to make objections.  (Doc. Nos. 29, 30 & 31.)  In a January 30, 2013, letter to the Court, Bradley

31

appears to raise a *Crawford* violation, asserting that he was not in attendance at the deposition of the medical doctor who examined the victim.  (Doc. No. 32.)  Although Bradley never requested to amend his Petition to include these claims, it would be futile for him to do so as they are defaulted and/or meritless.

First, Bradley has procedurally defaulted both of these alleged claims as he failed to raise and pursue them through the state's "ordinary appellate review procedures" and state law no longer would allow Bradley to do so.  *See Engle v. Isaac*, 456 U.S. 107, 125 n. 28.

Furthermore, regarding the stun belt claim, although the United States Supreme Court has yet to consider the issue of whether and when a trial court, consistent with constitutional protections, may order a defendant to wear a stun belt during his trial, the Supreme Court has clarified the contours of the clearly established constitutional protection against unnecessary physical restraints during trial.  *Deck v. Missouri*, 544 U.S. 622, 626, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).  *Deck*, and the bulk of federal cases discussing the use of physical restraints during trial and sentencing, involved traditional methods of securing the accused, such as handcuffs and shackles.  Nonetheless, in a § 2254 federal habeas case, the Sixth Circuit has held that even though no "individualized determination of necessity" was conducted by the trial court, a defendant's due process rights were not violated when the defendant's stun belt was not visible to the jury.  *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009); *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008).

Here, Bradley does not contend that the stun belt was visible to the jury, nor is there any evidence of such as it appears even his attorney was not aware that he was required to wear it. (Doc. No. 30-1.)  Moreover, Bradley does not contend that he testified falsely because of the belt.

## VI.  Evidentiary Hearing

Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition "alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing."  *Stanford v. Parker*, 266 F.3d 442, 459-460 (6th Cir. 2001) (*citing Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir.1994) (citation and internal

quotation omitted)).  However, a petition may be summarily dismissed if the record clearly indicates that the petitioner's claims are either barred from review or without merit.  *Id.*

In this case, upon review of the pleadings and transcripts, the procedural issues presented can be resolved from the record.  An evidentiary hearing is, therefore, not required.

### VII.  Conclusion

For the foregoing reasons, it is recommended that Bradley's Petition be denied.

s/ Greg White
United States Magistrate Judge

Date:  February 11, 2013

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).